DAVIS v. HOSPICE & PALLIATIVE CARE OF WINSTON-SALEM

[202 N.C. App. 660 (2010)]

Affirmed.

Judges ELMORE and STEELMAN concur.

―――――――――――

PAMELA S. DAVIS, EMPLOYEE, PLAINTIFF V. HOSPICE & PALLIATIVE CARE OF
WINSTON-SALEM, EMPLOYER, KEY RISK INSURANCE COMPANY, CARRIER,
DEFENDANTS

No. COA09-306

(Filed 2 March 2010)

### 1. Workers' Compensation— motion to reinstate total disability compensation—unsuccessful trial return to work—automatic duty after notice

The Industrial Commission did not err in a workers' compensation case by denying defendants the ability to present evidence on plaintiff employee's motion to reinstate total disability compensation after her unsuccessful trial return to work. Defendants had an automatic duty under N.C.G.S. § 97-32.1 to reinstate total disability compensation to plaintiff following notice, and defendants were required to follow the procedures in Chapter 97 if they wanted to cease making the reinstated disability payments.

### 2. Workers' Compensation— disability—unsuccessful return to work—findings

The Industrial Commission did not err in a workers' compensation case by concluding that plaintiff showed substantial evidence that she was disabled following her unsuccessful return to work in 2006. No findings by the Commission supported defendants' claim that Dr. Rauck intended plaintiff's disability status to be temporary pending some future appointment.

### 3. Workers' Compensation— change of treating physician—appeal of summary denial not required

The Industrial Commission did not err in a workers' compensation case by designating Dr. Rauck as plaintiff's treating physician in the 9 January 2008 opinion and award. Plaintiff was not required to appeal the summary denial of her motion for a change of treating physician under I.C. Rule 703 within fifteen days following the order since this issue was again raised by plaintiff in the pretrial agreement on 12 September 2006.

DAVIS v. HOSPICE & PALLIATIVE CARE OF WINSTON-SALEM

[202 N.C. App. 660 (2010)]

Appeal by defendants from Opinion and Award filed 2 October 2008 by the North Carolina Industrial Commission. Heard in the Court of Appeals 17 September 2009.

*Charles Peed and Associates, P.A., by J. William Snyder, Jr., for plaintiff-appellee.*

*Prather Law Firm, by J.D. Prather, for defendant-appellants.*

HUNTER, JR., Robert N., Judge.

On 2 October 2008, the Full Commission of the North Carolina Industrial Commission (the "Commission") found that Pamela S. Davis ("plaintiff") suffers from Complex Regional Pain Syndrome ("CRPS") secondary to the compensable back injury she sustained while working for Hospice & Palliative Care of Winston-Salem ("employer"). Employer and Key Risk Insurance Company (collectively "defendants") appeal the Commission's Opinion and Award arguing: (1) plaintiff's temporary total disability payments were improperly reinstated after an unsuccessful return to work, because the issue was not properly before the Deputy Commissioner for determination; (2) plaintiff did not prove that she remains disabled; and (3) the Commission erred in designating plaintiff's current physician, Dr. Richard Rauck, as an authorized treating physician given that plaintiff did not timely file an appeal from an order denying plaintiff's Motion for a Change of Treating Physician. We affirm.

*Facts*

Plaintiff began working for employer on 28 October 2002 as a staff nurse and case manager; her duties primarily included visiting patients in their homes to assist them with physical needs. On occasion, plaintiff had to lift patients in order to help them, which sometimes required her to lift in excess of 100 pounds.

On 18 November 2004, plaintiff lifted a home patient out of his chair in order to assess whether the patient had been injured in a recent fall. The patient initially used his own strength to aid plaintiff in the lift. Plaintiff customarily expected assistance from her patients during these maneuvers to the extent they were able. The patient suddenly stopped helping plaintiff midway through the lift. Unable to bear the entire weight of the patient, both plaintiff and patient fell back into the chair. During the accident, plaintiff suffered "pain in her arm and left shoulder that felt like an electrical shock that went down her left arm."

Plaintiff did not initially seek medical treatment for her injury, because she thought that treatment for work-related injuries needed to be approved in advance. She continued working for employer through early December 2004, though her pain continued to remain the same after her accident on 18 November 2004. On 7 December 2004, plaintiff again tried to assist a patient by moving him into a bed in his home. The morning after, the pain in "her neck and left upper extremity . . . was unbearable." Plaintiff then asked employer for authorization to see a physician, and she was referred by employer to PrimeCare of Highland Oaks ("PrimeCare") for medical treatment.

On 9 December 2004, plaintiff had her first appointment at PrimeCare, and she presented to Mr. Ken Bush, a physician's assistant being supervised by Dr. James T. Fink. Plaintiff told Mr. Bush that she had felt a pull on the left side of her neck radiating down her left arm on 18 November 2004, and that she had recently aggravated the injury. "She described the pain initially being sharp but that it later became a dull ache that radiated down into the fourth and fifth fingers of her left hand." During Mr. Bush's exam, he noted that plaintiff "exhibited positive tenderness to pressure applied to her left shoulder." Mr. Bush diagnosed plaintiff with a strain of her neck and left trapezius muscle, and prescribed medication and physical therapy. Mr. Bush also restricted plaintiff from doing work requiring either the use of her left arm or lifting overhead.

After learning of plaintiff's work restrictions, employer informed plaintiff that they did not have a job open within her restrictions. On 16, 18, and 23 December 2004, plaintiff met with Mr. Bush, and showed no improvement in the condition of her neck and left arm. While meeting with her physical therapist during this time, plaintiff said that she was experiencing swelling in her left hand and arm. At plaintiff's 23 December 2004 visit at PrimeCare, she reported that: (1) "she had been experiencing swelling in her left hand and particularly in her 4th and 5th fingers with decreased sensation[,]" (2) "she was not getting any relief with her oral pain medications[,]" and (3) "she was unable to sleep even with taking her prescribed Vicodin."

Sometime after the 23 December 2004 appointment with Mr. Bush, employer offered plaintiff a clerical, light-duty position. Plaintiff returned to work for two days, but was unable to complete the duties of the job because it required the use of her left hand. The trial return to work caused plaintiff's hand to swell, and she presented again to PrimeCare on 28 December 2004 for more treatment.

Plaintiff stated that the pain in her left arm had increased while trying to work, and that she could not take her pain medications during work hours. Mr. Bush noted during his exam "increased sensation over the last three fingers on [p]laintiff's left hand" and "tenderness to pressure along the left upper trapezius muscle." Mr. Bush then restricted plaintiff from working at all until her upcoming initial appointment on 4 January 2005 with her physiatrist,[1] Dr. John G. Bentley.

At her appointment with Dr. Bentley on 4 January 2005, plaintiff rated her pain a seven out of ten. "On physical examination, Dr. Bentley observed that [p]laintiff had hyperhidrosis, which is excessive sweating, of both palms, but she had no hyperemia[2] in her left hand." Dr. Bentley noted that plaintiff suffered from diminished sensation in her fifth finger on her left hand, and noticed that an MRI scan of plaintiff's cervical spine showed "disc bulges at several levels." These observations led Dr. Bentley to conclude that plaintiff was "suffering from left neck and upper extremity pain"; but because he could not locate the source of plaintiff's symptoms, he opined instead "that Reflex Sympathetic Dystrophy (RSD)[3] or Complex Regional Pain Syndrome (CRPS)[4] might be a differential diagnosis although he felt that the obvious characteristics of RSD or CRPS were not present at that time." Dr. Bentley continued to restrict plaintiff from work completely.

Following her appointment on 4 January 2005, plaintiff received an epidural steroid injection in an effort to relieve her pain and an EMG study to find out whether she was suffering from nerve irritation or damage. The injection provided plaintiff no significant relief, and the EMG study came back normal. Due to the results of the EMG, Dr. Bentley began to entertain "the idea that [plaintiff] might be suffering from [CRPS]."

---

1. A physician specializing in physical medicine and rehabilitation. *The American Heritage Dictionary* 935 (2d ed. 1985).

2. "Hyperemia" refers to an "excess of blood in a part due to local or general relaxation of the arterioles." *Dorland's Illustrated Medical Dictionary* 630 (26 ed. 1985).

3. In his deposition, Dr. Bentley explained that this was an "outdated term" for CRPS.

4. Dr. Rauck explained in his deposition that CRPS is a "neuropathic pain disorder" which is found predominately in a person's extremities. Type I stems from minor traumas not involving major nerve injury, and Type II manifests through the subsequent existence of pain outside the distribution of a past nerve injury.

Plaintiff met with Dr. Bentley again on 9 February 2005, and plaintiff described pain that was "intermittent, sharp, aching and burning" in her left hand and shoulder in addition to swelling in her fingers. Dr. Bentley found hyperhidrosis on plaintiff's left palm, but did not observe any swelling in the fingers of her left hand. "Dr. Bentley remarked that while he was not completely convinced of the diagnosis of CRPS[,] . . . he believed that the best course of action was to treat her as if she suffered from that condition." He recommended that plaintiff receive a sympathetic nerve block, and extended her total disability status until the next appointment.

On 18 February 2005, plaintiff presented to Dr. Albert Bartko for a second opinion at the request of defendants. Dr. Bartko stated that plaintiff "was not having any symptoms of frank CRPS"; however, as with Dr. Bentley, he similarly "suspected that [plaintiff] might be suffering from CRPS but that she might also be suffering from myofascial pain.[5]" Dr. Bartko commented that Dr. Bentley's treatment approach was "entirely appropriate."

Plaintiff met with Dr. Bentley again on 8 March 2005, and "complained of new soft tissue swelling in the medial aspect of the left arm and in all five fingers of her left hand." Dr. Bentley noted swelling in plaintiff's left arm and fingers, however, he did not observe any hyperhidrosis. In order to better determine whether plaintiff was suffering from CRPS, he ordered a triple-phase bone scan.

The bone scan came back negative for CRPS. At an appointment on 5 April 2005, Dr. Bentley "noted that [p]laintiff exhibited hyperhidrosis of the left palm and some slight [swelling] of the distal digits compared to the right[,]" and reported that plaintiff demonstrated "significant improvement in grip and tip pinch strength with physical therapy." Though Dr. Bentley's "impression remained that [plaintiff] was suffering from non-dermatomal pain of the left upper extremity status post injury at work with an undetermined [source,]" he continued to prescribe "treatment for [plaintiff] as if she actually suffered from CRPS Type I." After the visit, plaintiff's total disability status remained unchanged.

Dr. Bentley continued to be undecided about a final CRPS diagnosis for plaintiff through 14 June 2005 when he referred plaintiff to

---

5. "Myofascial Pain Syndrome" is characterized as the "[i]rritation of the muscles and fasciae (membranes) of the back and neck causing chronic pain (without evidence of nerve or muscle disease)." *Attorney's Dictionary of Medicine Illustrated* M-338 (2008).

Dr. Robert B. Wilson, a pain management specialist in Salisbury. Dr. Wilson examined plaintiff on 7 July 2005, and while focusing on plaintiff's left upper extremity, noted

> that her skin was slightly mottled and that the palm of her left hand was redder than the palm of her right hand. He also observed that the left upper extremity was drier to the touch than the right upper extremity. He noted that [p]laintiff complained of pain to light touching of the dorsum of the left hand but that she did not complain of pain to light touching of the dorsum of her right hand. He remarked about how much she protected her left upper extremity and that she tended to withdraw it during his initial attempts to examine it.

Based on these observations, Dr. Wilson diagnosed plaintiff conclusively with CRPS in her left upper extremity. On 19 July 2005, Dr. Bentley met with plaintiff for the last time, and he continued her total disability status.

At defendants' request, plaintiff met with Dr. Jeffrey Siegel on 12 September 2005 for another independent medical evaluation. After examining plaintiff, Dr. Siegel reported that plaintiff "lacked the 'cardinal' signs of CRPS or any neurological disorders that might explain her subjective symptoms[.]" Dr. Siegel further "speculated that [plaintiff] might be suffering from a previously unidentified orthopedic disorder or that she might be suffering from a somatoform[6] or other psychiatric disorder."

On 6 December 2005, Special Deputy Commissioner Layla T. Santa Rosa ordered defendants to authorize payment to plaintiff for a one-time appointment with Dr. Rauck; plaintiff presented to Dr. Rauck for her first appointment on 7 December 2005. Plaintiff rated her pain a seven out of ten, and described the pain as "dull, aching, and constant with episodes of being sharp and shooting." Plaintiff also complained of sensitivity to temperature along her upper extremity. Dr. Rauck observed a minimal amount of swelling during the visit, and "noted mild-to-moderate allodynia[7] in the left upper extremity, primarily in the medial aspect of the forearm." Dr. Rauck

---

6. "Somatoform Disorder" is "[a] condition marked by the presence of symptoms suggesting a physical disease but without physical changes or physiological mechanisms that might account for the symptoms." *Attorney's Dictionary of Medicine Illustrated* S-205 (2008).

7. "Allodynia" is "pain resulting from a non-noxious stimulus to normal skin." *Dorland's Illustrated Medical Dictionary* 49 (26 ed. 1985).

also noticed plaintiff's left hand did not have any redness. Based on these observations, "Dr. Rauck's impression was that [p]laintiff suffered from left upper extremity pain with qualities of CRPS," and recommended that plaintiff consider receiving spinal cord stimulation treatment to combat the CRPS.

Plaintiff met with psychologist Dr. Timothy Webster on 20 December 2005 in order to determine whether a spinal cord stimulator would be appropriate. In contrast to Dr. Siegel's findings, Dr. Webster "concluded that [plaintiff] did not suffer from any major psychopathology that would render spinal cord stimulation" inappropriate for her.

In January 2006, Dr. Rauck informed plaintiff that he would seek authorization from defendants to pay for a spinal cord stimulator. In a Form 61 dated 31 January 2006, defendants denied plaintiff's workers' compensation claim stating that plaintiff's symptoms were the result of a "cervical strain only." On 28 February 2006, Special Deputy Commissioner Santa Rosa entered an order denying a prior request by plaintiff to have Dr. Rauck designated one of her authorized treating physicians. Plaintiff requested a hearing to review the order via a Form 33 on 3 April 2006.

At an appointment with Dr. Rauck on 13 April 2006, plaintiff told Dr. Rauck that defendants had denied the claim for the spinal cord stimulator. During this examination plaintiff complained that she was suffering pain and discoloration in her face. Dr. Rauck prescribed plaintiff a Duragesic patch for the pain, and at an appointment on 10 May 2006, plaintiff stated that her pain had improved. Dr. Rauck continued to diagnose plaintiff with CRPS through 28 June 2006.

Defendants requested more independent evaluations of plaintiff in April and June 2006. Plaintiff met first with Dr. Hans Hansen on 23 April 2006; Dr. Hansen opined that plaintiff did not suffer from symptoms of CRPS. Plaintiff then had an appointment with Dr. Arne Newman on 13 June 2006. After examining plaintiff and observing her during a cigarette break,

> Dr. Newman opined that Plaintiff suffered from the Axis-I diagnoses of undifferentiated somatoform disorder, major depression, moderate and recurrent, and probable symptom exaggeration, and he also opined that [p]laintiff suffered from the Axis-II diagnosis of personality disorder with dependent and histrionic features. He opined that [p]laintiff's depression was the result of long-standing personality factors.

Both Dr. Newman and Dr. Hansen recommended against plaintiff receiving spinal cord stimulation treatment. The day after her appointment with Dr. Newman, defendants completed a Form 33 requesting a hearing which claimed that "[p]laintiff is no longer disabled and has failed to cooperate with medical treatment as provided by defendants."

On 12 September 2006, a hearing was held before Deputy Commissioner Chrystal Stanback, and the parties entered into a pretrial agreement for the competing Form 33 requests for hearings. After the hearing, the record was left open.

Several days prior to the hearing, on 6 September 2006, employer offered plaintiff a job as a Compliance Assistant at $18.00/hour, and demanded that she attend orientation for the position on 18 September 2006. Dr. Hansen reviewed the job description for this position as part of an examination of plaintiff in August 2006, and he believed that the job would be within her abilities given that he disagreed with the diagnosis of CRPS. Plaintiff deferred a decision on taking the job until she met with Dr. Rauck at a scheduled appointment on 15 September 2006. Though Dr. Rauck approved plaintiff for the Compliance Assistant job in a letter following the 15 September 2006 appointment conditioned on a list of restrictions regarding plaintiff's left hand, arm, and extremities, plaintiff did not attend the orientation on 18 September 2006. As a result, defendants filed a Form 24 dated 29 September 2006 to terminate or suspend plaintiff's compensation based on Dr. Hansen's opinion and plaintiff's failure to attend the orientation.

Plaintiff did eventually attempt a return to work with employer on a trial basis on 23 October 2006 at the Compliance Assistant position. At follow-up visits with Dr. Rauck on 7 and 30 November, plaintiff complained of lesions on her arms, severe pain, and new swelling in her neck and chest. Dr. Rauck placed plaintiff on total disability status again on 30 November 2006.

On 5 December 2006, plaintiff's counsel informed defendants' counsel by email of the unsuccessful trial return to work. On 21 December 2006, plaintiff's counsel served defendants with a Form 28U requesting that plaintiff's compensation be reinstated due to plaintiff's inability to return to work at the Compliance Assistant position. Defendant's counsel filed a response to plaintiff's motion to reinstate compensation by a letter dated 12 January 2007.

On 9 January 2008, Deputy Commissioner Stanback filed an Opinion and Award: (1) concluding that plaintiff was totally disabled due to her development of CRPS Type I subsequent to her injury on 18 November 2004; (2) authorizing Dr. Rauck to be plaintiff's treating physician; (3) reinstating plaintiff's total disability payments dating back to 30 November 2006; (4) awarding a 10% penalty on all payments overdue by 14 days since 30 November 2006; and (5) ordering defendants to pay all of plaintiff's past and continuing medical expenses, including payment for a spinal cord stimulator. The Commission affirmed the Deputy Commissioner's Opinion and Award with minor modifications on 2 October 2008. Defendants appeal.

*Analysis*

I.

[1] Defendants first argue they were improperly denied the ability to present evidence on plaintiff's motion to reinstate total disability compensation after her unsuccessful trial return to work. We disagree.

Total disability compensation must be reinstated under N.C. Gen. Stat. § 97-32.1 (2007) as soon as an employer has knowledge that an employee's return to work has been unsuccessful. *Burchette v. East Coast Millwork Distribs., Inc.*, 149 N.C. App. 802, 809, 562 S.E.2d 459, 463-64 (2002) (payments required to be reinstated at time employer acquired actual knowledge of unsuccessful return to work and employee did not file a Form 28U requesting reinstatement of compensation); *Roberts v. Dixie News, Inc.*, 189 N.C. App. 495, 500-01, 658 S.E.2d 684, 687 (2008) (after receiving a Form 28U, employer can only cease reinstated disability payments by following statutory procedures). If an employer wishes to contest the reinstatement of compensation after receiving a Form 28U from an employee, they may do so "only on the basis of N.C. Gen. Stat. § 97-18.1, N.C. Gen. Stat. §§ 97-83 and -84, or both." *Roberts*, 189 N.C. App. at 501, 658 S.E.2d at 687. Though an employee "should" give notice to an employer of an unsuccessful trial return to work via a Form 28U prior to total disability compensation resuming, a Form 28U is not required for reinstatement of compensation. I.C. Rule 404A(3) (2009); *Burchette*, 149 N.C. App. at 809, 562 S.E.2d at 463.

Here, defendants acquired actual knowledge of plaintiff's unsuccessful return to work on 5 December 2006 when plaintiff's counsel informed defendants by email. Defendants were informed again of plaintiff's unsuccessful return to work on 21 December 2006 when

plaintiff's counsel served defendants with a Form 28U requesting that plaintiff's disability compensation be reinstated. Thus, under our case law, defendants were under an automatic duty to reinstate total disability compensation to plaintiff on 5 December 2006, and if defendants wished to cease making the reinstated disability payments, they were required to follow the procedures under one of the listed sections in Chapter 97. Defendants never made a payment of total disability compensation upon receiving notice that plaintiff's attempted return to work was unsuccessful.

On 12 January 2007 and 17 September 2007, defendants wrote letters to Deputy Commissioner Stanback requesting that the issue of reinstatement not be ruled upon without defendants being given an opportunity to present evidence as to whether total disability should be reinstated. Defendants asked to depose Dr. Rauck in the letters, and did not receive a response from Deputy Commissioner Stanback. On appeal, defendants argue that these facts demonstrate that they were denied the opportunity to present evidence on the issue of whether total disability compensation should be reinstated.

Defendant's argument is misplaced. As explained, employers do not have the right to present evidence before reinstating disability compensation following notice of an unsuccessful return to work. When an employer receives notice, either through a Form 28U or other means of acquiring actual knowledge, then disability compensation should be reinstated automatically. Furthermore, the referenced letters defendants sent were written in January and September 2007. This was during the pendency of the action, when depositions were being taken. After defendants' first letter, the time for depositions was extended twice, which allowed defendants six additional months to depose Dr. Rauck. The sole reason defendants provided in their letter for wanting to depose Dr. Rauck was to oppose plaintiff's request for reinstatement of compensation. Defendants did not have this right, and nothing in the record shows that defendants were denied an opportunity to depose Dr. Rauck before the filing of the Opinion and Award.

Because G.S. § 97-32.1 mandates that defendants should have resumed plaintiff's compensation upon gaining knowledge of plaintiff's unsuccessful return to work, defendants were not denied any right to present evidence on whether disability compensation should have been reinstated. This assignment of error is overruled.

## II.

**[2]** Defendants contend that plaintiff failed to show that she is disabled following her unsuccessful return to work in 2006. We disagree.

When reviewing the Commission's finding as to disability, we are required to "determine whether the record contains any [competent] evidence tending to support the finding." *Anderson v. Construction Co.*, 265 N.C. 431, 434, 144 S.E.2d 272, 274 (1965). Even if other evidence in the record is contrary to a finding made by the Commission, "[t]he Commission's findings of fact [will] only be set aside in the complete absence of competent evidence to support them." *Gore v. Myrtle/Mueller*, 362 N.C. 27, 42, 653 S.E.2d 400, 410 (2007); *see Jones v. Desk Co.*, 264 N.C. 401, 402, 141 S.E.2d 632, 633 (1965). Unchallenged findings of fact by the Commission are binding on appeal. *Clayton v. Mini Data Forms, Inc.*, —— N.C. App. ——, ——, 681 S.E.2d 544, 545-46 (2009).

"Disability" under the North Carolina Workers' Compensation Act means "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment." N.C. Gen. Stat. § 97-2(9) (2007). An employee may prove "disability" by:

> (1) the production of medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment; (2) the production of evidence that he is capable of some work, but that he has, after a reasonable effort on his part, been unsuccessful in his effort to obtain employment; (3) the production of evidence that he is capable of some work but that it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to seek other employment; or (4) the production of evidence that he has obtained other employment at a wage less than that earned prior to the injury.

*Russell v. Lowes Product Distribution*, 108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993) (citations omitted). In addition to medical testimony, an employee's "own testimony that he is in pain" may be evidence of disability. *Weatherford v. Am. Nat'l Can Co.*, 168 N.C. App. 377, 381, 607 S.E.2d 348, 351 (2005).

In their brief, defendants specifically challenge Finding of Fact 10 in the Commission's Opinion and Award by listing Assignment of Error 22 under the argument heading. However, the record shows

that defendants assigned error to many other findings made by the Commission concerning plaintiff's disability, but those assignments of error are not listed or quoted in their brief on appeal.

Defendants' failure to list the appropriate assignments of error in their appellate brief is a non-jurisdictional violation of the North Carolina Rules of Appellate Procedure under Rule 28(b)(6). Pursuant to *Dogwood Dev. & Mgmt. Co., LLC v. White Oak Transp. Co.*, 362 N.C. 191, 657 S.E.2d 361 (2008); however, this Court will address the merits of defendants' appeal, albeit within the narrow scope of the contentions presented by defendants in their brief. *Dogwood*, 362 N.C. at 199, 657 S.E.2d at 366 ("In such instances, the appellate court should simply perform its core function of reviewing the merits of the appeal *to the extent possible*.") (emphasis added). The specific arguments offered by defendant are: (1) plaintiff presented "no evidence" that she remains disabled following her unsuccessful return to work under any of the four methods of *Russell*, and (2) even if plaintiff did suffer a disability beginning 30 November 2006, such disability should have lasted only until plaintiff's next appointment with Dr. Rauck.

Contrary to defendants' argument, in its findings, the Commission discussed plaintiff's evidence at length. Given that defendant does not argue with any sort of particularity that these findings are unsupported by competent evidence as required by the standard of review in this case, the following findings regarding plaintiff's disability are binding on this Court. *Mini Data Forms, Inc.*, —— N.C. App. at ——, 681 S.E.2d at 545-46.

33. With regard to her ability to work, [p]laintiff testified that, in her opinion, she was not able to work. She explained that she would need a job in which she would not have to use her left hand. She clarified that she does want to return to work eventually but that she has not been able to work since December 2004. Plaintiff testified that she was in pain in her left shoulder that extended down into her left arm. She described the pain as a burning and stabbing pain. Plaintiff is rarely, if ever, completely pain free. She complained of suffering from hand tremors, and she also complained of difficulty sleeping due to pain until Dr. Rauck started her on the Duragesic patch.

. . . .

37. Plaintiff commenced a trial return to work attempt in the position of Compliance Assistant on October 23, 2006. Plaintiff

returned to Dr. Rauck on November 7, 2006 for a follow-up visit. She reported no change in the baseline symptoms of her CRPS since her previous visit with Dr. Rauck, and she also reported having returned to work and that she was experiencing some neck pain secondary to having to bend her neck to perform her job duties. Dr. Rauck decided to continue her medication regimen since it was working well for her, but he recommended that she seek follow-up care if the lesions that he observed on her left arm did not heal within a reasonable time. Plaintiff returned to Dr. Rauck's office on November 30, 2006 complaining of severe pain for approximately one week after working two 8-hour shifts. Dr. Rauck noted that [p]laintiff was experiencing significantly worse pain on that date that she rated as being a "10" on a 10-point scale, which is the first time that he recalled her rating her pain level as being that high. On physical examination, [p]laintiff exhibited elevated swelling in the left arm. Dr. Rauck described it as the allodynia extended around into the chest area and into the axilla. At that time, he recommended that she remain out of work until her condition could be "straightened out," and [p]laintiff was placed on total disability status.

. . . .

39. At his deposition on December 19, 2006, Dr. Rauck testified that he hoped that [p]laintiff would not be out of work very long and that he was disappointed by the flare-up of [p]laintiff's pain. He opined that installation of a spinal cord stimulator would significantly increase the likelihood that [p]laintiff would be able to tolerate similar flare-ups in the future and also would enhance the likelihood that she would be able to return to work successfully. Dr. Rauck opined to a reasonable degree of medical probability that "her condition and symptoms and signs would be consistent with the type of injury" plaintiff sustained on November 18, 2004. Dr. Rauck further explained that, in his experience, lifting injuries by nurses tend to cause these types of injuries in the extremities, and he noted nothing in [p]laintiff's history of any pre-existing conditions that could be responsible for her symptoms.

40. The Full Commission finds as fact that as a direct and natural result of the [p]laintiff's compensable injury by accident to her left upper extremity that the [p]laintiff has contracted Complex Regional Pain Syndrome (CRPS) Type I of the

left upper extremity. The Full Commission assigns great weight to the opinion [of] Dr. Bentley, to whom the Plaintiff was referred at the request of the [d]efendant, Dr. Wilson, to whom the [p]laintiff was referred by Dr. Bentley and who was trained by Dr. Rauck and who has extensive experience diagnosing and treating CRPS, and the opinion of Dr. Rauck, who not only has extremely extensive experience in the diagnosis and treatment of CRPS but who also trained Dr. Wilson in the subspecialty of chronic pain management.

. . . .

42. The [p]laintiff commenced an unsuccessful trial return to work attempt on October 23, 2006, and has been totally disabled from any ability to work and earn wages since of [sic] November 30, 2006. The [d]efendants have failed to file any forms with the Commission indicating that they have reinstated payment of total disability compensation to the [p]laintiff as of November 30, 2006.

These findings show that (1) plaintiff offered a substantial amount of evidence demonstrating her disability after the unsuccessful return to work, and (2) no findings by the Commission support defendants' claim that Dr. Rauck intended plaintiff's disability status to be temporary pending some future appointment. These arguments and assignment of error are overruled.

### III.

[3] Defendants lastly argue that Dr. Rauck was improperly designated as plaintiff's treating physician in the 9 January 2008 Opinion and Award by Deputy Commissioner Stanback. In particular, defendants contend that I.C. Rule 703 precluded a decision on plaintiff's Motion for a Change of Treating Physician in Deputy Commissioner Stanback's Opinion and Award, because plaintiff did not timely appeal the denial of her motion on 28 February 2006 until she completed a Form 33 on 3 April 2006. We disagree.

I.C. Rule 703(1) provides in relevant part:

Orders, Decisions, and Awards made in a summary manner, without detailed findings of fact, including . . . *applications for change in treatment or providers of medical compensation* . . . may be appealed by requesting a hearing within 15 days of receipt of the Decision or receipt of the ruling on a Motion

to Reconsider. *These issues may also be raised and determined at a subsequent hearing.*

I.C. Rule 703(1) (2009) (emphasis added).

Here, plaintiff could have appealed the summary denial of her Motion for a Change of Treating Physician under I.C. Rule 703 in the 15 days following Special Deputy Commissioner Rosa's order. However, plaintiff was not required to appeal the summary order, because this issue was again raised by plaintiff in the pretrial agreement on 12 September 2006. Therefore, under I.C. Rule 703, plaintiff's motion was properly presented to Deputy Commissioner Stanback for consideration. This assignment of error is overruled, and the Opinion and Award of the Commission is

Affirmed.

Judges STEPHENS and BEASLEY concur.